

# UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

| | |
|---|---|
| JEFFREY EVANS, Derivatively On Behalf of NAVARRE CORPORATION,<br><br>        Plaintiff,<br><br>vs.<br><br>ERIC H. PAULSON, JAMES G. GILBERTSON, BRIAN M.T. BURKE, CARY L. DEACON, KEITH A. BENSON, CHARLES E. CHENEY, TIMOTHY R. GENTZ, TOM F. WEYL, DICKINSON G. WILTZ, JAMES G. SIPPL, MICHAEL L. SNOW AND ALFRED TEO,<br><br>        Defendants,<br><br><br>NAVARRE CORPORATION, a Minnesota corporation,<br><br>        Nominal Defendant. | Civil Action No. 05-1818 JMR/FLN<br><br>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, ABUSE OF CONTROL, GROSS MISMANAGEMENT, WASTE OF CORPORATE ASSETS, UNJUST ENRICHMENT AND VIOLATIONS OF THE SARBANES-OXLEY ACT OF 2002<br><br><br><br><br><br>DEMAND FOR JURY TRIAL |



Plaintiff, by his attorneys, submits this Verified Shareholder Derivative Complaint (the "Complaint") against the defendants named herein.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought by a shareholder of Navarre Corporation ("Navarre" or the "Company"), on behalf of the Company against certain of its officers and directors seeking to remedy defendants' violations of state and federal law, including violations of the Sarbanes-Oxley Act of 2002, breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment that occurred between October 2003 and the present (the "Relevant Period") and that have caused substantial losses to Navarre and other damages, such as to its reputation and goodwill.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over all claims asserted herein pursuant to 28 U.S.C. §1332(a)(2), because complete diversity exists between the plaintiff and each defendant, and the amount in controversy exceeds $75,000. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

2.      This court has jurisdiction over this action pursuant to 28 U.S.C §1331 in that plaintiff's claims arise in part out of the laws of the United States, including the Sarbanes-Oxley Act of 2002.

3.      This Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a) over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

4.      Venue is proper in an Minnesota District Court because one or more of the defendants either resides in or maintains executive offices in this District, a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein and aiding and abetting and conspiracy in violation of fiduciary duties owed to Navarre occurred in this District, and defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

1

## SUMMARY OF THE ACTION

5.     Navarre was formed in 1983 and is headquartered in New Hope, Minnesota. Nominal defendant Navarre engages in the publication and distribution of various home entertainment and multimedia products, including personal computer software, audio and video titles and interactive games.

6.     During the Relevant Period, defendants caused or allowed the Company to issue false financial results which understated expenses in at least the third quarter of FY:04 and first quarter of FY:05.[1] As a result, Navarre's stock traded at artificially inflated levels, trading above $15 per share during the second half of calendar year 2004.

7.     On January 10, 2005, the defendants caused or allowed Navarre to announce the acquisition of FUNimation Productions, Ltd. and The FUNimation Store, Ltd. (collectively "FUNimation") for $100 million in cash and between 1.495 million and 1.827 million shares of Navarre stock, depending on the price of Navarre stock. The press release noted FUNimation's growing sales from 2001 to 2003, but did not report its sales for any period of 2004.

8.     After this announcement, Navarre's stock reached its Relevant Period high of $18.77 per share.

9.     On January 18, 2005, the defendants caused or allowed Navarre to file a Shelf Registration Statement with the Securities and Exchange Commission ("SEC") to raise up to $140 million through the sale of its common stock to fund the acquisition of FUNimation. The Shelf Registration Statement reported the following with respect to FUNimation's financial results (while at the same time representing that FUNimation's quarterly results were not materially affected by seasonality):

> We believe that, if consummated, the FUNimation acquisition will continue the recent expansion of our publishing business, enable us to establish new relationships with vendors and customers and provide us with attractive content to publish and distribute. For the years ended December 31, 2001, 2002 and 2003, FUNimation had net sales of $49.8 million, $63.7 million and $81.6 million, respectively, and pre-tax income of $20.0 million, $24.9 million and $30.5 million,

---

[1]  Navarre's fiscal year ends on March 31.

respectively. For the nine months ended September 30, 2004, FUNimation's gross margin, after cost of wholesale and retail sales and royalty expense, was 51.3%.

10.     On January 26, 2005, the defendants caused or allowed Navarre to report favorable third quarter FY:05 results, which, according to defendants, reflected "the continuing execution of our strategic plan." On the conference call following the earnings release, defendants were forced to acknowledge increased inventory levels and refused to confirm earnings guidance. One analyst on the call also pointed out that Navarre had concealed a 22% decline in FUNimation's sales during interim 2004:

> [ANALYST]: One more quick question on the Funamation acquisition. I'm reading that your sales were down 22% through September 2004. Can you tell me why this material fact was not in the Press Release.
>
> [COMPANY SPEAKER]: We filed the document, the S3. Any information about the transaction, you can refer to that, we won't take questions related to that for obvious reasons.

11.     After the call and earnings release, analysts following Navarre decreased their estimates for Navarre's FY:05 and FY:06 EPS. The Company's stock price dropped as well, falling to the $10 to $12 per share range.

12.     Then, on February 22, 2005, the defendants caused or allowed the Company to suddenly withdraw its Registration Statement initially filed for purposes of funding its acquisition of FUNimation. This sudden withdrawal reignited rumors that the Company's accounting was problematic. On this news, the stock dropped to below $7 per share.

13.     Later, on May 31, 2005, the defendants caused or allowed the Company to issue a press release entitled "Navarre Corporation to Postpone Release of Fourth Quarter and Fiscal Year 2005 Financial Results and Related Investor Conference Call." The press release stated in relevant part:

> ***The Company is presently determining the amount and timing of recognition of deferred compensation expense related to the Company's Chief Executive Officer's 2001 employment agreement, as amended December, 2003, which have been on file with the Securities and Exchange Commission. The Company is also reviewing the recognition and classification of certain fiscal 2005 tax items.***
>
> ***As a result of these items, the year end closing process is taking longer than anticipated and the Company has concluded that it is necessary to postpone the scheduled earnings release and subsequent conference call scheduled for***

*Wednesday, June 1, 2005, at 11:00 am EDT. The Company currently anticipates that these non-cash charges may require a restatement of prior periods and will have an impact on the Company's historical financial statements, but have no impact on cash flows.*

*The Company is moving quickly and carefully to address these matters and report its consolidated results as soon as practical. Additional details regarding the earnings release and conference call will be forthcoming.*

14.     As a result of this announcement, Navarre's stock dropped to $8 per share, compared to the $18 per share prices it traded at during the Relevant Period.

15.     On June 14, 2005, the defendants caused or allowed the Company to file a Form 10-K with the SEC. The Form 10-K for the fiscal year ending March 31, 2005, stated in relevant part:

> In June 2005, our management, after consultation with the Audit Committee of the Board of Directors, determined that our consolidated financial statements for the third fiscal quarter ended December 31, 2003, year ended March 31, 2004, first fiscal quarter ended June 30, 2004, second fiscal quarter ended September 30, 2004, and third fiscal quarter ended December 31, 2004 should no longer be relied upon. As a result of the fiscal year 2005 audit, it was determined that expenses related to the incentive-based deferred compensation of our Chief Executive Officer should have been recorded in the third fiscal quarter of 2004 and first fiscal quarter of 2005. As a result, additional expenses and accrued liabilities of $1.5 million and $2.2 million have been recorded in these quarters, respectively. These expenses were determined in accordance with the provisions of the Chief Executive Officer's 2001 employment agreement.

> It was also determined that our deferred tax benefit recorded in the third fiscal quarter of 2005 was improperly included in income and should have increased common stock. Consequently, the tax benefit of $2.4 million recognized during the third fiscal quarter of 2005 was reduced and common stock increased by the same amount.

## THE PARTIES

16.     Plaintiff Jeffrey Evans is, and was at times relevant hereto, an owner and holder of Navarre common stock. Plaintiff is a citizen of Florida.

17.     Nominal defendant Navarre is a corporation organized and existing under the laws of the state of Minnesota with its headquarters located at 7400 49th Avenue North, New Hope, Minnesota. Navarre engages in the publication and distribution of various home entertainment and multimedia products, including personal computer software, audio and video titles and interactive games. The Company operates in distribution and publishing segments. The distribution segment is operated through the Company. This segment distributes and offers fulfillment services in connection with various finished goods that are provided by its vendors, which include various

4

publishers, music labels, and movie studios. These finished goods comprise personal computer software, compact disc and DVD audio, DVD and VHS video, video games and accessories. This segment provides retailers and publishers with services for the distribution of these products, including vendor-managed inventory, electronic data interchange services, fulfillment services, cross docking and assumed receipt and retailer-oriented marketing services. The publishing segment is operated through its Encore Software and BCI Eclipse entities. This segment is the licensee or owner of personal computer software, compact disc and DVD audio, DVD and VHS video and video game titles. This segment licenses, packages, markets, and sells these products to third-party distributors, directly to retailers. Navarre's international customers include wholesale clubs, mass merchandisers, other third-party distributors, computer specialty stores, music specialty stores, book stores, office superstores and electronic superstores. Navarre was formed in 1983 and is headquartered in New Hope, Minnesota. Navarre is a citizen of Minnesota.

18.     Defendant Eric H. Paulson ("Paulson") is, and at all times relevant hereto was, Chairman of the Board of Directors (the "Board"), President, Chief Executive Officer ("CEO") and a director of Navarre. Because of Paulson's positions, he knew the adverse non public information about the business of Navarre, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Paulson participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. For FY:05, FY:04 and FY:03, Navarre paid defendant Paulson $3,701,651, $2,528,675 and $796,610, respectively, in salary, bonus and other compensation, and granted him 50,000 and 150,000 options to purchase Navarre stock, in FY:04 and FY:03, respectively. During the Relevant Period, Paulson sold 700,100 shares of Navarre stock for proceeds of $9,495,081.90. Paulson is a citizen of Minnesota.

19.     Defendant James G. Gilbertson ("Gilbertson") was, at times relevant hereto, Chief Financial Officer ("CFO") and a director of Navarre until his resignation on July 12, 2005. Because

5

of Gilbertson's positions, he knew the adverse non public information about the business of Navarre, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and via reports and other information provided to him in connection therewith. During the Relevant Period, Gilbertson participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. For FY:05, FY:04 and FY:03, Navarre paid defendant Gilbertson $430,173, $296,261 and $251,598, in salary, bonus and other compensation, and granted him 25,000, 25,000 and 50,000 options to purchase Navarre stock, respectively. During the Relevant Period, Gilbertson sold 78,500 shares of Navarre stock for proceeds of $729,318.30. Gilbertson is a citizen of Minnesota.

20.    Defendant Brian M.T. Burke ("Burke") is, and at all times relevant hereto was, Chief Operating Officer of Distribution of Navarre. Because of Burke's position, he knew the adverse non public information about the business of Navarre, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith. During the Relevant Period, Burke participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. For FY:05, FY:04 and FY:03, Navarre paid defendant Burke $408,919, $301,388 and $271,865, respectively, in salary, bonus and other compensation, and granted him 25,000, 25,000 and 60,000 options to purchase Navarre stock, respectively. During the Relevant Period, Burke sold 78,600 shares of Navarre stock for proceeds of $758,068.98. Burke is a citizen of Oregon.

21.    Defendant Cary L. Deacon ("Deacon") is, and at all times relevant hereto was, Chief Operating Officer of Publishing of Navarre. Because of Deacons' position, he knew the adverse non public information about the business of Navarre, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and

other information provided to him in connection therewith. During the Relevant Period, Deacon participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. For FY:05, FY:04 and FY:03, Navarre paid defendant Deacon $416,519, $245,844 and $54,146, respectively, in salary, bonus and other compensation, and granted him 25,000, 25,000 and 250,000 options to purchase Navarre stock, respectively. During the Relevant Period, Deacon sold 150,000 shares of Navarre stock for proceeds of $2,347,888.12. Deacon is a citizen of Minnesota.

22.     Defendant Keith A. Benson ("Benson") is, and at all times relevant hereto was, a director of Navarre. Because of Benson's position, he knew the adverse non public information about the business of Navarre, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Benson participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Benson is a citizen of Minnesota.

23.     Defendant Charles E. Cheney ("Cheney") is, and at all times relevant hereto was, a director of Navarre. Because of Cheney's position, he knew the adverse non public information about the business of Navarre, specifically, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Cheney participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. During the Relevant Period, Cheney sold 63,700 shares of Navarre stock for proceeds of $787,590. Cheney is a citizen of Minnesota.

24.     Defendant Timothy R. Gentz ("Gentz") is, and at all times relevant hereto was, a director of Navarre. Because of Gentz's position, he knew the adverse non public information about the business of Navarre, as well as its finances, markets and present and future business prospects,

7

via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Gentz participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Gentz is a citizen of Minnesota.

25. Defendant Tom F. Weyl ("Weyl") is, and at all times relevant hereto was, a director of Navarre. Because of Weyl's position, he knew the adverse non public information about the business of Navarre, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Weyl participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. During the Relevant Period, Weyl sold 10,000 shares of Navarre stock for proceeds of $117,936. Weyl is a citizen of New Jersey.

26. Defendant Dickinson G. Wiltz ("Wiltz") is, and at all times relevant hereto was, a director of Navarre. Because of Wiltz's position, he knew the adverse non public information about the business of Navarre, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Wiltz participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. During the Relevant Period, Wiltz sold 15,000 shares of Navarre stock for proceeds of $183,900. Wiltz is a citizen of Minnesota.

27. Defendant James G. Sippl ("Sippl") is, and at all times relevant hereto was, a director of Navarre. Because of Sippl's position, he knew the adverse non public information about the business of Navarre, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other

information provided to him in connection therewith. During the Relevant Period, Sippl participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. During the Relevant Period, Sippl sold 8,000 shares of Navarre stock for proceeds of $107,557.64. Sippl is a citizen of Minnesota.

28.     Defendant Michael L. Snow ("Snow") is, and at all times relevant hereto was, a director of Navarre. Because of Snow's position, he knew the adverse non public information about the business of Navarre, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Snow participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. During the Relevant Period, Snow sold 14,000 shares of Navarre stock for proceeds of $74,698.40. Snow is a citizen of Minnesota.

29.     Defendant Alfred Teo ("Teo") was, at times relevant hereto, a director of Navarre until his resignation April 22, 2004. Because of Teo's position, he knew the adverse non public information about the business of Navarre, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Teo participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Teo is a citizen of New Jersey.

30.     The defendants identified in ¶¶18, 19, 22-29 are referred to herein as the "Director Defendants." The defendants identified in ¶¶18-21 are referred to herein as the "Officer Defendants." The defendants identified in ¶¶18-21, 23, 25-28 are referred to herein as the "Insider Selling Defendants." Collectively, the Director Defendants, the Officer Defendants and the Insider Selling Defendants are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

31.     By reason of their positions as officers, directors and/or fiduciaries of Navarre and because of their ability to control the business and corporate affairs of Navarre, the Individual Defendants owed Navarre and its shareholders fiduciary obligations of trust, loyalty, good faith and due care, and were and are required to use their utmost ability to control and manage Navarre in a fair, just, honest and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Navarre and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

32.     Each director and officer of the Company owes to Navarre and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.  In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's revenue, margins, operations, performance, management, projections and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

33.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Navarre, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.  Because of their advisory, executive, managerial and directorial positions with Navarre, each of the Individual Defendants had access to adverse non public information about the financial condition, operations, and improper representations of Navarre.

34.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Navarre, and was at all times acting within the course and scope of such agency.

35.     To discharge their duties, the officers and directors of Navarre were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of Navarre were required to, among other things:

      (a)     refrain from acting upon material inside corporate information to benefit themselves;

      (b)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

      (c)     conduct the affairs of the Company in an efficient, business like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

      (d)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

      (e)     remain informed as to how Navarre conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

      (f)     ensure that the Company was operated in a diligent, honest and prudent manner in compliance with all applicable federal, state and local laws, rules and regulations.

      36.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Navarre, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and/or directors of the Company

during the Relevant Period has been ratified by the remaining Individual Defendants who collectively comprised all of Navarre's Board during the Relevant Period.

37.     The Individual Defendants breached their duties of loyalty and good faith by allowing defendants to cause or by themselves causing the Company to misrepresent its financial results and prospects, as detailed herein *infra*, and by failing to prevent the Individual Defendants from taking such illegal actions. In addition, as a result of defendants' illegal actions and course of conduct during the Relevant Period, the Company is now the subject of several class action law suits that allege violations of federal securities laws. As a result, Navarre has expended and will continue to expend significant sums of money. Such expenditures include, but are not limited to:

(a)     Costs incurred to carry out internal investigations, including legal fees paid to outside counsel; and

(b)     Costs incurred in investigating and defending Navarre and certain officers in the class actions, plus potentially millions of dollars in settlements or to satisfy an adverse judgment.

38.     Moreover, these actions have irreparably damaged Navarre's corporate image and goodwill. For at least the foreseeable future, Navarre will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Navarre's ability to raise equity capital or debt on favorable terms in the future is now impaired.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

39.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breach of their respective duties.

40.     During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to and did: (i) conceal the fact that the Company was improperly misrepresenting its financial results, in order to allow the Individual Defendants to artificially inflate the price of the Company's shares; (ii) maintain the Individual

Defendants' executive and directorial positions at Navarre and the profits, power and prestige that the Individual Defendants enjoyed as a result of these positions; and (iii) deceive the investing public, including shareholders of Navarre, regarding the Individual Defendants' management of Navarre's operations, the Company's financial health and stability, and future business prospects, specifically related to the Company's financials that had been misrepresented by the Individual Defendants throughout the Relevant Period. In furtherance of this plan, conspiracy and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

41. The Individual Defendants engaged in a conspiracy, common enterprise and/or common course of conduct commencing by at least October 2003 and continuing thereafter. During this time the Individual Defendants caused or allowed the Company to conceal the true fact that Navarre was misrepresenting its financial results. In addition, the Individual Defendants also made other specific, false statements about Navarre's financial performance and future business prospects, as alleged herein.

42. The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment; to conceal adverse information concerning the Company's operations, financial condition and future business prospects; and to artificially inflate the price of Navarre common stock so they could: (i) dispose of over $14.6 million of their personally held stock; (ii) protect and enhance their executive and directorial positions and the substantial compensation and prestige they obtained as a result thereof; and (iii) use artificially inflated stock to acquire FUNimation.

43. The Individual Defendants accomplished their conspiracy, common enterprise and/or common course of conduct by causing the Company to purposefully, recklessly or negligently misrepresent its financial results. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary and substantial participant in the conspiracy, common enterprise and/or common course of conduct complained of herein.

44. Each of the Individual Defendants aided and abetted and rendered substantial

13

assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## BACKGROUND

45.     Navarre was formed in 1983 and is headquartered in New Hope, Minnesota. Navarre engages in the publication and distribution of various home entertainment and multimedia products, including personal computer software, audio and video titles and interactive games.

## IMPROPER STATEMENTS

46.     On January 21, 2004, the Individual Defendants caused or allowed the Company to issue a press release entitled "Navarre Corporation Reports 31% Sales Increase and Record Net Income in the Third Quarter of Fiscal 2004; Company Reports Its Tenth Consecutive Quarter of Profitability." The press release stated in relevant part:

> Navarre Corporation, a leading distributor and publisher of a broad range of home entertainment and multimedia software products, today reported record sales and net income for the fiscal 2004 third quarter ended December 31, 2003.
>
> Highlights for the quarter include:
>
> - Consolidated net sales increased approximately 31% to $153.0 million from $117.0 million last year.
>
> - Consolidated net income increased by approximately 20% to $3.6 million or $0.15 per share as compared to $3.0 million or $0.14 per share last year on a fully diluted basis. The net income includes a non-recurring charge of approximately $1.4 million in the third quarter (this charge represents $0.06 per share). This charge was comprised of a non-recurring, non-cash charge for stock based compensation of $536,000 and a special charge for non-recurring debt retirement expense of $908,000 incurred in connection with the complete discharge of the Hilco financing used for the BCI acquisition.
>
> - Income from operations grew by approximately 51% to $4.5 million as compared to $3 million in the same period last year.
>
> - The Company reported $14.1 million cash and no debt at the end of the quarter.
>
> ***Eric Paulson, President and CEO stated, "The Company achieved the largest quarterly sales and profit result in its 20 year history. Management continues to aggressively execute our operating plan for organic and acquisition***

*growth. NDS continued its strong organic growth and the quarter's sales represent record volume for the division. NDS continued to grow its foothold in the productivity space and expand its customer roster of major label music and DVD Video. The highlight of the quarter for NDS was the volume generated by video games."*

Paulson continued, "The slight decline in NEM sales in the quarter reflects our move away from holiday driven titles. We anticipate our fourth fiscal quarter results will reflect our improved roster of artists and labels. Encore demonstrated strong growth with its commitment to increase its licensing and content expansion in the PC category."

Paulson concluded, "As well, we are very encouraged by BCI's results for November and December. *We continue to be bullish about this acquisition and its potential to add to Navarre's earnings.*"

For the third quarter ended December 31, 2003

Navarre reported an increase in consolidated net sales of approximately 31% to $153.0 million compared with $116.9 million in last year's third quarter. On a divisional basis, NDS, which distributes non-proprietary entertainment products including computer software, video games, major label music and DVD video, reported a net sales increase of approximately 32% to $132.3 million compared to $100.1 million in the fiscal third quarter last year. The division saw increased revenues during the quarter from strong e-commerce sales from its e-commerce retail customers, increased distribution of productivity titles to its chain customers, as well as continued strong sales in internet security products.

47.     On February 23, 2004, the Individual Defendants caused or allowed the Company to issue a press release entitled "Navarre Corporation Raises Guidance for Net Sales and Net Income for Fiscal 2004." The press release stated in relevant part:

Navarre Corporation, a distributor and publisher of a broad range of home entertainment and multimedia software products, today raised guidance for net sales and net income for the 2004 fiscal year.

*The Company is now forecasting that its fiscal year 2004 net sales will increase 23 to 25%, and its net income is expected to increase 70 to 80% over the prior fiscal year. The Company had previously announced guidance that projected an increase in net sales of 7 to 10%, and an increase in net income of 14 to 25% over the prior fiscal year.*

Eric Paulson, President and CEO, Navarre Corporation, stated, "Our Distribution business has demonstrated superior organic growth across all of the categories it distributes; PC and console software, DVD Video and music. The Publishing Group is experiencing excellent sales and continues to add to Navarre's overall margin and profit. *We believe that it is important to update our guidance to more clearly represent these trends and their impact on our results for this fiscal year."*

48.     On May 26, 2004, the Individual Defendants caused or allowed the Company to issue a press release entitled "Navarre Corporation Reports Record Quarterly and Fiscal Year 2004 Profit

and Sales; Company Provides Guidance for Fiscal Year 2005; ***Company Reports 11th Consecutive***

***Profitable Quarter***." The press release stated in relevant part:

> Navarre Corporation, a leading publisher and distributor of a broad range of home entertainment and multimedia software products, today reported fiscal 2004 fourth quarter and year-end results for the period ended March 31, 2004.
>
> - Net sales for the fiscal fourth quarter ended March 31, 2004, increased 70% to $142.6 million as compared to $83.6 million for the same quarter ended March 31, 2003.
>
> - Net income for the fiscal fourth quarter increased 641% to $3.3 million or $0.12 fully diluted earnings per share as compared to $442,000 or $0.02 fully diluted earnings per share for the same period last year.
>
> - Net sales for the fiscal year ended March 31, 2004, increased 32% to $475.2 million as compared to $359.4 million for the fiscal year ended March 31, 2003.
>
> - Net income increased 106% to $8.9 million or $0.37 fully diluted earnings per share compared to $4.3 million or $0.20 fully diluted earnings per share over the same period last year.
>
> Eric Paulson, Chairman and CEO of Navarre Corporation, commented, "Fiscal Year 2004 was another record year for our company, both operationally and financially. Our 4th quarter results were also a company record. The restructuring of our company has allowed us to increase our focus on growing the high margin publishing segment of our business while we continue to focus on aggressive organic growth in our core distribution business. In the last twelve months, the Company grew over $110 million."
>
> Paulson continued, "Our distribution segment provides a highly efficient foundation for our current publishing business. This foundation assists in making our acquisitions even more profitable as we drive sales and consolidate back room operations. The company will also continue to seek out acquisitions and co-publishing transactions, such as Riverdeep, in the publishing sector."
>
> Paulson concluded, "Included in our results, is our management decision to shut down the development of Encore's video game console projects which primarily consisted of the Daredevil video game project. As a result, the Company wrote off $4.3 million of development costs during the quarter and a total of $5.6 million for the fiscal year. These charges are reflected as a reduction in our gross margin. We have refocused Encore on its core competencies of software publishing."
>
> Business Segment Highlights
> Distribution Services
>
> The Distribution Services segment distributes software, video games, accessories, major label music and DVD video, as well as independent music. For the 4th quarter, ended March 31, 2004, the segment achieved a 55% increase in net sales to $127.2 million, as compared to $82.3 million for the same period last year. The segment achieved a 26% increase in net sales to $449.1 million, for the fiscal

year ended March 31, 2004, as compared to $355.9 million for the same period last year.

The segment's growth during the 2004 fiscal year was achieved through increases in all of its product groups. Software continues to expand its market share presence across all categories. Internet security and anti-virus products remained strong in light of continued virus outbreaks. Major label music, DVD video and Video Games grew due to the combinations of increased publisher and customer rosters and benefited from strong releases throughout the year. Independent music also grew due to its increased label and artist roster and its continued focus on catalog across all music genres.

Publishing and Licensing

The publishing segment of Navarre includes Encore Software and BCI DVD video. For the 4th quarter, ended March 31, 2004, the segment achieved sales of $20.0 million before inter-company sales elimination of $4.6 million as compared to $6.2 million before inter-company sales elimination of $4.8 million for the same period last year. For the year ended March 31, 2004, the segment achieved $46.2 million in sales before inter-company sales elimination of $20 million. This compares to last year's sales of $14.7 million and before inter-company sales elimination of $11.2 million. Navarre purchased BCI Eclipse, LLC. November 1, 2003.

49. On July 21, 2004, the Individual Defendants caused or allowed the Company to issue a press release entitled "Navarre Corporation Reports Record First Quarter Fiscal 2005 Profit and Sales; Company Raises Its 2005 Sales and Earnings Projections." The press release stated in relevant part:

Navarre Corporation, a leading publisher and distributor of a broad range of home entertainment and multimedia software products, today reported fiscal 2005 first quarter results for the period ended June 30, 2004.

Highlights for the quarter include:

- Consolidated net sales for the quarter increased 73% to $126.7 million from $73.1 million in the same period last year.

- Consolidated income from operations increased to $4.5 million from $224,000 in the same period last year.

- Consolidated net income for the quarter increased to $4.6 million or $0.16 per diluted share compared with $308,000 or $0.01 per diluted share in the same period last year.

- Gross margin on a consolidated basis for the quarter, as a percent to net sales, was 14.9% compared with 13.7% in the same period last year.

- Operating expenses on a consolidated basis for the quarter, as a percent to net sales were 11.4% compared with 13.4% in the same period last year.

17

- An acquisition credit facility was established with GE Commercial Finance that provides up to a $20 million revolving credit facility for acquisitions.

- The Company reported cash and cash equivalents of $12.2 million and no debt at the end of the first fiscal quarter.

- Publishing revenue, before inter-company elimination, represented 21.5% of total net sales in the quarter versus 6.0% last year.

- Company reports 12th consecutive profitable quarter.

Eric Paulson, Chairman and CEO of Navarre Corporation stated, "The results of our first fiscal quarter 2005 reflect continued momentum across all business sectors at the Company. The evolution of our Company's strategy is underway as evidenced by the Publishing revenue, representing 21.5% of sales, before inter-company elimination, in the quarter versus 6.0% last year. The organization structure, breaking out Publishing and Distribution, was put in place prior to the end of fiscal year 2004 and continues to lead our revenue and profit growth. Publishing manages and controls content. Distribution provides improved services and cost savings for Navarre and its subsidiaries as well as for our trading partners."

Paulson continued, "We expect our new warehouse material handling facilities to come online shortly. This facility will handle our growth and should take our already efficient distribution capabilities to an even higher level. This year we will be holding our annual shareholder meeting at our corporate headquarters and allowing the attendees to tour this state-of-the-art facility."

***Jim Gilbertson, VP, CFO stated, "In June we established an acquisition credit facility with GE Commercial Finance. The agreement provides the Company with a credit line of up to $20 million for acquisitions. This agreement will help us achieve our previously stated acquisition growth goals."***

A reconciliation of net sales with and without inter-company eliminations of sales appears in an accompanying table. Net sales before eliminations are measures of performance that are not defined by generally accepted accounting principles ("GAAP") and should be viewed in addition to, and not in lieu of, net sales as reported on a GAAP basis.

50.     On October 20, 2004, the Individual Defendants caused or allowed the Company to issue a press release entitled "Navarre Corporation Reports Record Second Quarter Fiscal 2005 Profit and Sales; Company Raises Its Fiscal Year 2005 Sales and Earnings Projections." The press release stated in relevant part:

Navarre Corporation, a leading publisher and distributor of a broad range of home entertainment and multimedia software products, today reported fiscal 2005 second quarter results for the period ended September 30, 2004.

Highlights for the quarter include:

- Consolidated net sales for the quarter increased 36% to $146.2 million from $107.5 million in the same period last year.

- Consolidated income from operations for the quarter increased to $4.9 million from $1.7 million in the same period last year.

- Consolidated net income for the quarter increased to $4.9 million or $.17 per diluted share compared with $1.7 million or $0.08 per diluted share in the same period last year.

- Gross margin on a consolidated basis for the quarter, as a percent to net sales, was 14.3% compared with 12.6% in the same period last year.

- Operating expenses on a consolidated basis for the quarter, as a percent to net sales remained 11.0%, as in the same period last year.

- The Company reported cash and cash equivalents of $8.3 million and no debt at the end of the second fiscal quarter.

- Publishing revenue, before inter-company elimination, represented 14.2% of total net sales in the quarter versus 8.2% last year.

- Company reports 13th consecutive profitable quarter.

Eric Paulson, Chairman and CEO of Navarre Corporation, stated, "The results of our second fiscal quarter 2005 reflect the continuing execution of our strategic plan. Both our Publishing and Distribution segments continue to meet our expectations and our organic growth remains on track."

Paulson continued, "Our new distribution facilities and material handling systems are coming on-line and will be operationally effective during the fiscal 3rd quarter. The implementation costs incurred to bring these systems online were approximately $435,000 during the quarter. These initiatives position the Company's operating capabilities to support our future growth. As we have stated, we anticipate the positive expense benefits to be reflected in our results next fiscal year."

Jim Gilbertson, Vice President/Chief Financial Officer, commented, "The organic growth of the Company's Distribution segment is on track. Personal computer software grew due to strong sales of new Internet security and anti-virus products. DVD video and console video games also continued to grow as a result of increased publishers as well as benefiting from strong releases throughout the quarter. The Publishing segment represented 14.2% of the company's revenues for the quarter, before inter-company elimination, an increase from 8.2% during the same period last year. In addition to the increased percentage of top-line revenue, the Publishing segment has increased the Company's overall margins."

SECOND QUARTER ENDED SEPTEMBER 30, 2004

For the second quarter ended September 30, 2004, Navarre reported an increase of 36% in consolidated net sales to $146.2 million, as compared with $107.5 million for the second quarter of fiscal 2004. The Company reported gross margin of $21.0 million or 14.3%, as compared with $13.5 million or 12.6% in the comparable period last year. Total operating expenses for the quarter were $16.0 million or 11.0% as compared with $11.8 million or 11.0% in last year's second quarter. Income from operations for the second quarter ended September 30, 2004 increased 186.2% to $4.9 million, as compared with $1.7 million the same period last year. Net income for the period increased 186.1% to $4.9 million, compared with $1.7 million in the

comparable period last year. Fully diluted earnings per share for the second quarter ended September 30, 2004 were $0.17 per share, compared with $0.08 per share in the comparable period last year.

51.     On January 10, 2005, the Individual Defendants caused or allowed the Company to issue a press release entitled "Navarre Agrees to Acquire FUNimation, a Leading Provider and Licensor of Anime and Children's Entertainment." The press release stated in relevant part:

> Navarre Corporation a leading publisher and distributor of broad range of home entertainment and multimedia software products, announced that it has executed a definitive agreement to acquire 100% of the general limited partnership interests in FUNimation Productions, Ltd. and the FUNimation Store, Ltd. Navarre anticipates that this transaction will close before May 15, 2005.
>
> FUNimation based in Fort Worth, Texas, is a leading home video distributor and licensor of Japanese animation and children's entertainment in the United States providing titles that include Dragonball Z, Dragonball GT, Yu Yu Kahusho, Case Closed and Fulmetal Alchemist. In addition to the home video distribution of its proprietary content, FUNimation engages in third-party marketing, sales and distribution agreements with content providers, including 4Kids Entertainment, Inc., Nelvana, Alliance Atlantis and WBGH. FUNimation also acquires master licenses to properties through long-term arrangements and leverages this proprietary content into various revenue streams including television broadcast, VHS and DVD home videos, toys, video games, and trading cards. For the years ended December 31, 2001, 2002 and 2003, FUNimation had net sales of $49.8 million, $63.7 million and $81.6 million, respectively, and pre-tax net income of $20.0 million, $24.9 million and $30.5 million, respectively.
>
> Navarre is acquiring the FUNimation partnership interests for a payment at closing by Navarre of approximately $100,500,000 in cash, plus its issuance of between 1,495,216 and 1,827,486 shares of Navarre common stock.
>
> Eric Paulson, Chairman and CEO of Navarre stated, "The completion of the FUNimation acquisition will be a continuation of the transformation of our company as it reflects the ongoing execution of our strategy to utilize the strong underlying asset of our distribution business to support and assist in the growth of our higher margin publishing business." Paulson continued, "FUNimation will bring new business skills of international licensing and brand development. With the signing of this agreement, we look forward to welcoming FUNimation to the portfolio of companies in our Publishing segment."

52.     Subsequent to this release, Navarre's stock price reached its Relevant Period high of $18.77 per share.

53.     On January 18, 2005, the Individual Defendants caused or allowed the Company to file a Shelf Registration Statement with the SEC to raise up to $140 million through the sale of its common stock to fund the acquisition of FUNimation. The Shelf Registration Statement reported the following with respect to FUNimation's financial results (while at the same time representing that

FUNimation's quarterly results were not materially affected by seasonality):

> We believe that, if consummated, the FUNimation acquisition will continue the recent expansion of our publishing business, enable us to establish new relationships with vendors and customers and provide us with attractive content to publish and distribute. For the years ended December 31, 2002, 2002 and 2003, FUNimation had net sales of $49.8 million, $63.7 million and $81.6 million, respectively, and pre-tax income of $20.0 million, $24.9 million and $30.5 million, respectively. For the nine months ended September 30, 2004, FUNimation's gross margin, after cost of wholesale and retail sales and royalty expense, was 51.3%.

### THE TRUTH BEGINS TO EMERGE

54. On January 26, 2005, the Individual Defendants caused or allowed the Company to

issue a press release entitled "Navarre Corporation Reports Record Profit and Sales for 3rd Quarter

of Fiscal 2005; Company Reports Its 14th Consecutive Quarter of Profitability." The press release

stated in relevant part:

> Navarre Corporation, a publisher and distributor of a broad range of home entertainment and multimedia software products, today reported record sales and net income for the fiscal 2005 third quarter ended December 31, 2004.
>
> Financial highlights for the quarter include:
>
> - Consolidated net sales increased approximately 18% to $183.6 million from $156.0 million for the same quarter last year.
>
> - Consolidated net income increased to $10.4 million, or $0.36 per diluted share, as compared to $3.6 million, or $0.15 per diluted share, for the same period last year.
>
> - Income from operations grew to $8.1 million as compared to $4.5 million in the same period last year.
>
> ***Eric Paulson, Chairman and CEO, stated, "The results of our third fiscal quarter reflect the continuing execution of our strategic plan. Our Distribution segment continues to meet our expectations and our organic growth remains on track***. Of particular note, net sales from our Publishing segment, before inter-company sales elimination, grew approximately 76% for the quarter versus the same period last year. The sales increase in our Publishing segment reinforces our ability to grow this business organically. A great portion of this increase is attributable to the sales of newly licensed products."
>
> ***Jim Gilbertson, Vice President and CFO, stated, "The Company continues to manage its overall capital position to aid growth. Significant growth in the anti-virus software category has caused us to hold higher levels of inventory to meet future sales demands from our retail customers. The payment terms with these vendors is slightly less favorable compared to other vendors. In the Publishing segment, the Company invested $5 million in advances on previously announced licenses in the quarter. As well, we have invested in more inventory to support our publishing growth."***

Fiscal 2005 third quarter ended December 31, 2004

Navarre reported an increase in consolidated net sales of approximately 18% to $183.6 million compared with $156.0 million in last year's third quarter. On a business segment basis, the Distribution segment, which distributes home entertainment products, including computer software, video games, major label and independent music and DVD video, reported a net sales increase of approximately 18% to $175.9 million compared to $149.2 million in the fiscal third quarter last year before inter-company sales elimination. Before inter-company sales elimination, Navarre's Publishing segment reported increased sales of approximately 76% to $21.6 million versus $12.3 million during the same period last year.

Consolidated net income increased to $10.4 million or $0.36 per diluted share as compared to $3.6 million or $0.15 per diluted share for the same period last year.

## THE TRUTH IS REVEALED

55. On the conference call following the earnings release, the Individual Defendants were forced to acknowledge increased inventory levels and refused to confirm earnings guidance. One analyst on the call also pointed out that Navarre had concealed a 22% decline in FUNimation's sales during interim 2004:

[ANALYST]: One more quick question on the Funamation acquisition. I'm reading the that your sales were down 22% through September 2004. Can you tell me why this material fact was not in the Press Release.

[COMPANY SPEAKER]: We filed the document, the S3. Any information about the transaction, you can refer to that, we won't take questions related to that for obvious reasons.

56. After the call and earnings release, analysts following Navarre decreased their estimates for Navarre's fiscal 2005 and fiscal 2006 EPS.

57. The withdrawal sent the Company's shares tumbling from $15.50 to $11.18 in the following trading days – a consecutive multiple day drop of approximately 30%.

58. Then, on February 22, 2005, the Individual Defendants caused or allowed the Company to issue a press release entitled "Navarre Corporation Files Application to Withdraw Registration Statement." The press release stated in relevant part:

Navarre Corporation, a publisher and distributor of a broad range of home entertainment and multimedia software products, today announced that it has filed an application with the Securities and Exchange Commission for the withdrawal of the Registration Statement filed on January 18, 2005 .... The Company is considering various sources of financing to fund the initial cash portion of the FUNimation acquisition.

Navarre's President and CEO, Eric Paulson, stated, "The Company continues to work toward the completion of the agreement to acquire FUNimation and we expect to complete the transaction as previously announced."

59.     On February 22, 2005, the Individual Defendants caused or allowed the Company to finalize its Form 10-K which would quash previous rumors as to the veracity of the Company's accounting, the Company suddenly withdrew its Shelf Registration Statement initially filed for purposes of funding its acquisition of FUNimation. This sudden withdrawal reignited rumors that the Company's accounting was problematic. On this news, the stock dropped to below $7 per share.

60.     On May 31, 2005, the Individual Defendants caused or allowed the Company to issue a press release entitled "Navarre Corporation to Postpone Release of Fourth Quarter and Fiscal Year 2005 Financial Results and Related Investor Conference Call." The press release stated in relevant part:

> Navarre Corporation a publisher and distributor of a broad range of home entertainment and multimedia software products, announced today that it will postpone release of its fourth quarter and fiscal year 2005 financial results.
>
> ***The Company is presently determining the amount and timing of recognition of deferred compensation expense related to the Company's Chief Executive Officer's 2001 employment agreement, as amended December, 2003, which have been on file with the Securities and Exchange Commission. The Company is also reviewing the recognition and classification of certain fiscal 2005 tax items.***
>
> As a result of these items, the year end closing process is taking longer than anticipated and the Company has concluded that it is necessary to postpone the scheduled earnings release and subsequent conference call scheduled for Wednesday, June 1, 2005, at 11:00 am EDT. The Company currently anticipates that these non-cash charges may require a restatement of prior periods and will have an impact on the Company's historical financial statements, but have no impact on cash flows.
>
> The Company is moving quickly and carefully to address these matters and report its consolidated results as soon as practical. Additional details regarding the earnings release and conference call will be forthcoming.

61.     On June 1, 2005, Navarre's stock price dropped to $8.02 a share on an extremely heavy volume of trading of over 1.5 million shares.

## REASONS THE STATEMENTS WERE IMPROPER

62.     The Individual Defendants caused or allowed Navarre's financials to be false and misleading for approximately two years due to its improper accounting for compensation expenses. As a result, Navarre's results were presented in violation of Generally Accepted Accounting

Principles ("GAAP"). The Individual Defendants have caused or allowed Navarre to admit it improperly recorded a tax benefit of $2.4 million in its third quarter fiscal 2005 results released on January 26, 2005.

## IMPROPER FINANCIAL REPORTING DURING THE RELEVANT PERIOD

63.    GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practices at a particular time. Regulation S-X, 17 C.F.R. §210.4-01(a)(1), states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosures that would be duplicative of disclosures accompanying annual financial statements.

64.    Pursuant to GAAP, as set forth in Accounting Principles Board Opinion ("APB") No. 20, the type of restatements and revisions announced by Navarre were to correct for material errors in previously issued financial statements. APB No. 20, ¶¶7-13. The restatement of past financial statements is a disfavored method of recognizing an accounting change as it dilutes confidence by investors in the financial statements, it makes it difficult to compare financial statements and it is often difficult, if not impossible, to generate the numbers when restatement occurs. *Id.* ¶14. Thus, GAAP provides that financial statements should only be restated in limited circumstances, *i.e.,* when there is a change in the reporting entity, there is a change in accounting principles used or to correct an error in previously issued financial statements. Navarre's restatements and revisions were not due to a change in reporting entity or a change in accounting principle, but rather to errors in previously issued financial statements. Thus, the restatements and revisions were an admission by defendants that Navarre's previously issued financial results and its public statements regarding those results were false and misleading. Moreover, immaterial corrections are not required to be restated. *Id.* ¶38. Thus, the restatement indicates that the errors were material.

## THE RESTATEMENT

65.    On June 14, 2005, the Individual Defendants caused or allowed the Company to file a Form 10-K with the SEC. The Form 10-K for the fiscal year ending March 31, 2005 stated in

relevant part:

Restatements

| | 2005 | Fiscal Years Ended March 31, 2004 (Restated) | 2003 |
|---|---|---|---|
| Net Sales: | | | |
| Distribution | 93.4 | 94.40% | 99.00% |
| Publishing | 16.1 | 9.8 | 4.1 |
| Elimination of sales | 9.5 | 4.2 | 3.1 |
| | | | |
| Total net sales | 100 | 100 | 100 |
| Cost of sales-exclusive of depreciation and amortization | 84.7 | 87.7 | 87.3 |
| | | | |
| Gross Profit | 15.3 | 12.3 | 12.7 |
| | | | |
| Selling and marking | 3.7 | 3.6 | 3.9 |
| Distribution and warehousing | 1.5 | 1.3 | 1.5 |
| General and administrative | 7.5 | 5.4 | 5.6 |
| Depreciation and amortization | 0.6 | 0.4 | 0.6 |
| | | | |
| Total operating expenses | 13.3 | 10.7 | 11.6 |
| | | | |
| Income from operations | 2 | 1.6 | 1.1 |
| | | | |
| Interest expense | 0.1 | 0.1 | 0.1 |
| Interest income | 0.1 | 0.1 | — |
| Debt extinguishment | — | 0.2 | — |
| Other income (expense), net | — | — | 0.2 |
| | | | |
| Tax benefit | 0.1 | 0.1 | — |
| | | | |
| Net income | 2.1 | 1.5 | 1.2 |

\* \* \*

        In June 2005, our management, after consultation with the Audit Committee of the Board of Directors, determined that our consolidated financial statements for the third fiscal quarter ended December 31, 2003, year ended March 31, 2004, first fiscal quarter ended June 30, 2004, second fiscal quarter ended September 30, 2004, and third fiscal quarter ended December 31, 2004 should no longer be relied upon. As a result of the fiscal year 2005 audit, it was determined that expenses related to the incentive-based deferred compensation of our Chief Executive Officer should have been recorded in the third fiscal quarter of 2004 and first fiscal quarter of 2005. As a result, additional expenses and accrued liabilities of $1.5 million and $2.2 million have been recorded in these quarters, respectively. These expenses were determined in accordance with the provisions of the Chief Executive Officer's 2001 employment agreement.

        It was also determined that our deferred tax benefit recorded in the third fiscal quarter of 2005 was improperly included in income and should have increased common stock. Consequently, the tax benefit of $2.4 million recognized during the

third fiscal quarter of 2005 was reduced and common stock increased by the same amount.

\* \* \*

Management's Report on Internal Control over Financial Reporting

Management of the Company is responsible for establishing and maintaining adequate internal control over financial reporting ("Internal control") as defined in Rules 13a-15(f) and 15d-15(f) under the Securities Exchange Act of 1934, as amended (the "Exchange Act"). A material weakness is a significant deficiency (within the meaning of Public Company Accounting Oversight Board Auditing Standard No. 2), or a combination of significant deficiencies, that results in there being more than a remote likelihood that a material misstatement of the Company's annual or interim consolidated financial statements will not be prevented or detected.

Management assessed the effectiveness of the Company's internal control over financial reporting as of March 31, 2005, using the criteria published in the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in *Internal Control-Integrated Framework*. Based on this assessment, management concluded the Company did not maintain effective control over financial reporting as of March 31, 2005, because of the following material weaknesses in the Company's internal control over financial reporting:

***The Company did not maintain effective controls over the accounting for certain compensation arrangements***. Specifically, the Company had a deficiency in the design of controls to identify the proper accounting treatment for compensation arrangements for key employees. Adjustments related to a deferred compensation arrangement with a key employee were included in the restatement of the Company's consolidated financial statements for the third quarter in the year ended March 31, 2004 and the first quarter of the year ended March 31, 2005.

***The Company did not maintain effective controls over the accounting for income taxes***. Specifically, the Company's established internal controls surrounding the preparation of its income tax provision for the third quarter ended December 31, 2004 were not effective. During the year end financial reporting process, the Company identified an error in the preparation of the third quarter tax provision. This material weakness resulted in adjustments that were included in the restatement of the Company's consolidated financial statements for the third quarter in the year ended March 31, 2005.

66.    As a result of the Individual Defendants' actions, Navarre's market capitalization has been damaged by over $484 million. At the same time that the defendants were causing Navarre to suffer such devastation of its market capitalization, the Insider Selling Defendants fared much better by selling over $14.6 million of their personally held stock.

## ILLEGAL INSIDER SELLING

67.    While in possession of the undisclosed material adverse information, the Insider Selling Defendants sold the following shares of Navarre stock:

| NAME | DATE | SHARES | PRICE | PROCEEDS |
|------|------|--------|-------|----------|
| Eric H. Paulson | 1/3/2005 | 2,198 | $ 17.75 | $ 39,014.50 |
| | 1/3/2005 | 400 | $ 17.62 | $ 7,048.00 |
| | 1/3/2005 | 702 | $ 17.63 | $ 12,376.26 |
| | 1/3/2005 | 800 | $ 17.85 | $ 14,280.00 |
| | 1/3/2005 | 800 | $ 17.82 | $ 14,256.00 |
| | 1/3/2005 | 1,200 | $ 17.76 | $ 21,312.00 |
| | 1/3/2005 | 300 | $ 17.77 | $ 5,331.00 |
| | 1/3/2005 | 2,600 | $ 17.65 | $ 45,890.00 |
| | 1/3/2005 | 300 | $ 17.67 | $ 5,301.00 |
| | 1/3/2005 | 200 | $ 17.88 | $ 3,576.00 |
| | 1/3/2005 | 400 | $ 17.90 | $ 7,160.00 |
| | 1/3/2005 | 100 | $ 17.92 | $ 1,792.00 |
| | 1/3/2005 | 600 | $ 17.95 | $ 10,770.00 |
| | 1/3/2005 | 1,600 | $ 17.57 | $ 28,112.00 |
| | 1/3/2005 | 2,300 | $ 17.56 | $ 40,388.00 |
| | 1/3/2005 | 500 | $ 17.60 | $ 8,800.00 |
| | 1/3/2005 | 100 | $ 17.59 | $ 1,759.00 |
| | 1/3/2005 | 600 | $ 17.58 | $ 10,548.00 |
| | 1/3/2005 | 200 | $ 17.64 | $ 3,528.00 |
| | 1/3/2005 | 600 | $ 17.79 | $ 10,674.00 |
| | 1/3/2005 | 2,362 | $ 17.81 | $ 42,067.22 |
| | 1/3/2005 | 38 | $ 17.84 | $ 677.92 |
| | 1/3/2005 | 3,400 | $ 17.80 | $ 60,520.00 |
| | 1/3/2005 | 200 | $ 17.83 | $ 3,566.00 |
| | 1/3/2005 | 1,100 | $ 17.27 | $ 18,997.00 |
| | 1/3/2005 | 600 | $ 17.26 | $ 10,356.00 |
| | 1/3/2005 | 300 | $ 17.42 | $ 5,226.00 |
| | 1/3/2005 | 4,500 | $ 17.38 | $ 78,210.00 |
| | 1/3/2005 | 300 | $ 17.39 | $ 5,217.00 |
| | 1/3/2005 | 200 | $ 17.32 | $ 3,464.00 |
| | 1/3/2005 | 100 | $ 17.34 | $ 1,734.00 |
| | 1/3/2005 | 100 | $ 17.28 | $ 1,728.00 |
| | 1/3/2005 | 3,000 | $ 17.30 | $ 51,900.00 |
| | 1/3/2005 | 1,100 | $ 17.31 | $ 19,041.00 |
| | 1/3/2005 | 100 | $ 17.33 | $ 1,733.00 |
| | 1/3/2005 | 5,400 | $ 17.37 | $ 93,798.00 |
| | 1/3/2005 | 100 | $ 17.36 | $ 1,736.00 |
| | 1/3/2005 | 1,800 | $ 17.35 | $ 31,230.00 |
| | 1/3/2005 | 300 | $ 17.40 | $ 5,220.00 |
| | 1/3/2005 | 2,700 | $ 17.43 | $ 47,061.00 |
| | 1/3/2005 | 2,300 | $ 17.41 | $ 40,043.00 |
| | 1/3/2005 | 400 | $ 17.53 | $ 7,012.00 |
| | 1/3/2005 | 100 | $ 17.54 | $ 1,754.00 |
| | 1/3/2005 | 300 | $ 17.55 | $ 5,265.00 |
| | 1/3/2005 | 900 | $ 17.47 | $ 15,723.00 |
| | 1/3/2005 | 1,300 | $ 17.48 | $ 22,724.00 |
| | 1/3/2005 | 500 | $ 17.52 | $ 8,760.00 |
| | 12/1/2004 | 1,000 | $ 17.12 | $ 17,120.00 |
| | 12/1/2004 | 100 | $ 17.15 | $ 1,715.00 |
| | 12/1/2004 | 100 | $ 17.02 | $ 1,702.00 |

| 12/1/2004 | 100 | $ | 17.02 | $ | 1,702.00 |
|---|---|---|---|---|---|
| 12/1/2004 | 7,300 | $ | 17.00 | $ | 124,100.00 |
| 12/1/2004 | 100 | $ | 17.09 | $ | 1,709.00 |
| 12/1/2004 | 700 | $ | 17.06 | $ | 11,942.00 |
| 12/1/2004 | 6,500 | $ | 17.07 | $ | 110,955.00 |
| 12/1/2004 | 3,600 | $ | 17.08 | $ | 61,488.00 |
| 12/1/2004 | 300 | $ | 17.04 | $ | 5,112.00 |
| 12/1/2004 | 3,300 | $ | 17.05 | $ | 56,265.00 |
| 12/1/2004 | 3,100 | $ | 16.97 | $ | 52,607.00 |
| 12/1/2004 | 100 | $ | 16.98 | $ | 1,698.00 |
| 12/1/2004 | 3,100 | $ | 16.93 | $ | 52,483.00 |
| 12/1/2004 | 300 | $ | 16.94 | $ | 5,082.00 |
| 12/1/2004 | 10,200 | $ | 16.91 | $ | 172,482.00 |
| 12/1/2004 | 4,100 | $ | 16.92 | $ | 69,372.00 |
| 12/1/2004 | 1,700 | $ | 17.10 | $ | 29,070.00 |
| 12/1/2004 | 4,400 | $ | 16.95 | $ | 74,580.00 |
| 11/15/2004 | 200 | $ | 18.09 | $ | 3,618.00 |
| 11/15/2004 | 200 | $ | 18.10 | $ | 3,620.00 |
| 11/15/2004 | 200 | $ | 18.11 | $ | 3,622.00 |
| 11/15/2004 | 100 | $ | 18.06 | $ | 1,806.00 |
| 11/15/2004 | 1,300 | $ | 18.07 | $ | 23,491.00 |
| 11/15/2004 | 400 | $ | 18.08 | $ | 7,232.00 |
| 11/15/2004 | 800 | $ | 18.03 | $ | 14,424.00 |
| 11/15/2004 | 1,900 | $ | 18.04 | $ | 34,276.00 |
| 11/15/2004 | 9,900 | $ | 18.05 | $ | 178,695.00 |
| 11/15/2004 | 46,900 | $ | 18.00 | $ | 844,200.00 |
| 11/15/2004 | 19,700 | $ | 18.01 | $ | 354,797.00 |
| 11/15/2004 | 18,400 | $ | 18.02 | $ | 331,568.00 |
| 11/1/2004 | 200 | $ | 14.92 | $ | 2,984.00 |
| 11/1/2004 | 1,000 | $ | 14.93 | $ | 14,930.00 |
| 11/1/2004 | 5,600 | $ | 14.89 | $ | 83,384.00 |
| 11/1/2004 | 3,800 | $ | 14.90 | $ | 56,620.00 |
| 11/1/2004 | 700 | $ | 14.91 | $ | 10,437.00 |
| 11/1/2004 | 4,500 | $ | 14.86 | $ | 66,870.00 |
| 11/1/2004 | 9,100 | $ | 14.87 | $ | 135,317.00 |
| 11/1/2004 | 6,300 | $ | 14.88 | $ | 93,744.00 |
| 11/1/2004 | 1,300 | $ | 14.83 | $ | 19,279.00 |
| 11/1/2004 | 2,600 | $ | 14.84 | $ | 38,584.00 |
| 11/1/2004 | 7,000 | $ | 14.85 | $ | 103,950.00 |
| 11/1/2004 | 100 | $ | 14.80 | $ | 1,480.00 |
| 11/1/2004 | 1,000 | $ | 14.81 | $ | 14,810.00 |
| 11/1/2004 | 300 | $ | 14.82 | $ | 4,446.00 |
| 11/1/2004 | 500 | $ | 14.75 | $ | 7,375.00 |
| 11/1/2004 | 400 | $ | 14.76 | $ | 5,904.00 |
| 11/1/2004 | 2,900 | $ | 14.78 | $ | 42,862.00 |
| 11/1/2004 | 1,000 | $ | 14.59 | $ | 14,590.00 |
| 11/1/2004 | 100 | $ | 14.69 | $ | 1,469.00 |
| 11/1/2004 | 1,100 | $ | 14.70 | $ | 16,170.00 |
| 11/1/2004 | 400 | $ | 14.51 | $ | 5,804.00 |
| 11/1/2004 | 100 | $ | 14.52 | $ | 1,452.00 |
| 10/1/2004 | 400 | $ | 14.36 | $ | 5,744.00 |
| 10/1/2004 | 6,300 | $ | 14.30 | $ | 90,090.00 |

| | | | | |
|---|---|---|---|---|
| 10/1/2004 | 100 | $ | 14.31 | $ | 1,431.00 |
| 10/1/2004 | 2,700 | $ | 14.35 | $ | 38,745.00 |
| 10/1/2004 | 500 | $ | 14.24 | $ | 7,120.00 |
| 10/1/2004 | 5,400 | $ | 14.25 | $ | 76,950.00 |
| 10/1/2004 | 200 | $ | 14.29 | $ | 2,858.00 |
| 10/1/2004 | 6,500 | $ | 14.20 | $ | 92,300.00 |
| 10/1/2004 | 7,200 | $ | 14.21 | $ | 102,312.00 |
| 10/1/2004 | 100 | $ | 14.22 | $ | 1,422.00 |
| 10/1/2004 | 200 | $ | 14.08 | $ | 2,816.00 |
| 10/1/2004 | 1,300 | $ | 14.10 | $ | 18,330.00 |
| 10/1/2004 | 4,600 | $ | 14.17 | $ | 65,182.00 |
| 10/1/2004 | 900 | $ | 14.03 | $ | 12,627.00 |
| 10/1/2004 | 300 | $ | 14.04 | $ | 4,212.00 |
| 10/1/2004 | 4,700 | $ | 14.05 | $ | 66,035.00 |
| 10/1/2004 | 2,400 | $ | 14.00 | $ | 33,600.00 |
| 10/1/2004 | 4,400 | $ | 14.01 | $ | 61,644.00 |
| 10/1/2004 | 100 | $ | 14.02 | $ | 1,402.00 |
| 10/1/2004 | 200 | $ | 13.91 | $ | 2,782.00 |
| 10/1/2004 | 1,500 | $ | 13.99 | $ | 20,985.00 |
| 9/21/2004 | 100 | $ | 16.43 | $ | 1,643.00 |
| 9/21/2004 | 1,500 | $ | 16.45 | $ | 24,675.00 |
| 9/21/2004 | 800 | $ | 16.36 | $ | 13,088.00 |
| 9/21/2004 | 800 | $ | 16.37 | $ | 13,096.00 |
| 9/21/2004 | 4,500 | $ | 16.40 | $ | 73,800.00 |
| 9/21/2004 | 10,300 | $ | 16.25 | $ | 167,375.00 |
| 9/21/2004 | 2,100 | $ | 16.30 | $ | 34,230.00 |
| 9/21/2004 | 13,900 | $ | 16.35 | $ | 227,265.00 |
| 9/21/2004 | 100 | $ | 16.16 | $ | 1,616.00 |
| 9/21/2004 | 1,400 | $ | 16.17 | $ | 22,638.00 |
| 9/21/2004 | 2,200 | $ | 16.20 | $ | 35,640.00 |
| 9/21/2004 | 100 | $ | 16.04 | $ | 1,604.00 |
| 9/21/2004 | 7,200 | $ | 16.05 | $ | 115,560.00 |
| 9/21/2004 | 6,500 | $ | 16.15 | $ | 104,975.00 |
| 9/21/2004 | 33,100 | $ | 16.00 | $ | 529,600.00 |
| 9/21/2004 | 9,500 | $ | 16.02 | $ | 152,190.00 |
| 9/21/2004 | 100 | $ | 16.03 | $ | 1,603.00 |
| 9/1/2004 | 50,000 | $ | 15.55 | $ | 777,650.00 |
| 8/3/2004 | 500 | $ | 16.00 | $ | 8,000.00 |
| 8/2/2004 | 200 | $ | 15.83 | $ | 3,166.00 |
| 8/2/2004 | 1,600 | $ | 15.85 | $ | 25,360.00 |
| 8/2/2004 | 100 | $ | 15.91 | $ | 1,591.00 |
| 8/2/2004 | 5,700 | $ | 15.80 | $ | 90,060.00 |
| 8/2/2004 | 400 | $ | 15.81 | $ | 6,324.00 |
| 8/2/2004 | 1,000 | $ | 15.82 | $ | 15,820.00 |
| 8/2/2004 | 1,300 | $ | 15.77 | $ | 20,501.00 |
| 8/2/2004 | 3,900 | $ | 15.78 | $ | 61,542.00 |
| 8/2/2004 | 100 | $ | 15.79 | $ | 1,579.00 |
| 8/2/2004 | 2,500 | $ | 15.74 | $ | 39,350.00 |
| 8/2/2004 | 1,400 | $ | 15.75 | $ | 22,050.00 |
| 8/2/2004 | 3,000 | $ | 15.76 | $ | 47,280.00 |
| 8/2/2004 | 100 | $ | 15.71 | $ | 1,571.00 |
| 8/2/2004 | 100 | $ | 15.72 | $ | 1,572.00 |

|  | | | | |
|---|---|---|---|---|
|  | 8/2/2004 | 400 | $ 15.73 | $ 6,292.00 |
|  | 8/2/2004 | 1,600 | $ 15.68 | $ 25,088.00 |
|  | 8/2/2004 | 100 | $ 15.69 | $ 1,569.00 |
|  | 8/2/2004 | 5,400 | $ 15.70 | $ 84,780.00 |
|  | 8/2/2004 | 9,100 | $ 15.65 | $ 142,415.00 |
|  | 8/2/2004 | 4,600 | $ 15.66 | $ 72,036.00 |
|  | 8/2/2004 | 3,300 | $ 15.67 | $ 51,711.00 |
|  | 8/2/2004 | 600 | $ 15.61 | $ 9,366.00 |
|  | 8/2/2004 | 200 | $ 15.62 | $ 3,124.00 |
|  | 8/2/2004 | 3,100 | $ 15.64 | $ 48,484.00 |
|  | 8/2/2004 | 200 | $ 15.59 | $ 3,118.00 |
|  | 8/2/2004 | 5,300 | $ 16.00 | $ 84,800.00 |
|  | 2/27/2004 | 182,500 | $ 6.67 | $ 1,217,275.00 |
|  | 2/26/2004 | 17,500 | $ 6.90 | $ 120,750.00 |
|  |  | **700,100** |  | **$ 9,495,081.90** |
|  |  |  |  |  |
| Charles E. Cheney | 7/28/2004 | 50,000 | $ 14.29 | $ 714,500.00 |
|  | 11/13/2003 | 500 | $ 5.34 | $ 2,670.00 |
|  | 11/13/2003 | 1,000 | $ 5.32 | $ 5,320.00 |
|  | 11/13/2003 | 6,700 | $ 5.35 | $ 35,845.00 |
|  | 11/13/2003 | 4,500 | $ 5.31 | $ 23,895.00 |
|  | 11/13/2003 | 1,000 | $ 5.36 | $ 5,360.00 |
|  |  | **63,700** |  | **$ 787,590.00** |
|  |  |  |  |  |
| Tom Weyl | 6/1/2004 | **10,000** | $ 11.79 | **$ 117,936.00** |
|  |  |  |  |  |
| Dickinson G. Wiltz | 6/1/2004 | 10,000 | $ 12.29 | $ 122,900.00 |
|  | 6/1/2004 | 5,000 | $ 12.20 | $ 61,000.00 |
|  |  | **15,000** |  | **$ 183,900.00** |
|  |  |  |  |  |
| James G. Sippl | 6/15/2004 | 3,764 | $ 13.45 | $ 50,625.80 |
|  | 6/15/2004 | 4,236 | $ 13.44 | $ 56,931.84 |
|  |  | **8,000** |  | **$ 107,557.64** |
|  |  |  |  |  |
| James G. Gilbertson | 7/27/2004 | 10,000 | $ 15.01 | $ 150,100.00 |
|  | 7/27/2004 | 15,000 | $ 15.01 | $ 225,150.00 |
|  | 7/27/2004 | 7,000 | $ 15.01 | $ 105,070.00 |
|  | 7/27/2004 | 1,000 | $ 15.01 | $ 15,010.00 |
|  | 11/10/2003 | 45,500 | $ 5.14 | $ 233,988.30 |
|  |  | **78,500** |  | **$ 729,318.30** |
|  |  |  |  |  |
| Brian M.T. Burke | 9/8/2004 | 2,000 | $ 14.92 | $ 29,831.00 |
|  | 8/5/2004 | 1,200 | $ 14.94 | $ 17,925.24 |
|  | 8/5/2004 | 600 | $ 14.94 | $ 8,962.62 |
|  | 8/5/2004 | 4,800 | $ 14.94 | $ 71,700.96 |
|  | 8/5/2004 | 4,000 | $ 14.94 | $ 59,750.80 |
|  | 8/5/2004 | 1,000 | $ 14.94 | $ 14,937.70 |
|  | 6/8/2004 | 1,600 | $ 13.56 | $ 21,696.96 |
|  | 6/1/2004 | 6,000 | $ 12.14 | $ 72,852.00 |
|  | 6/1/2004 | 20,000 | $ 12.14 | $ 242,840.00 |
|  | 1/27/2004 | 7,800 | $ 6.62 | $ 51,636.00 |
|  | 1/27/2004 | 2,500 | $ 6.65 | $ 16,625.00 |

| | | | | | | |
|---|---|---|---|---|---|---|
| | 1/27/2004 | 900 | $ | 6.65 | $ | 5,987.70 |
| | 12/19/2003 | 2,400 | $ | 5.62 | $ | 13,488.00 |
| | 12/19/2003 | 1,000 | $ | 5.61 | $ | 5,610.00 |
| | 12/19/2003 | 2,000 | $ | 5.61 | $ | 11,220.00 |
| | 12/19/2003 | 1,000 | $ | 5.62 | $ | 5,620.00 |
| | 12/19/2003 | 5,000 | $ | 5.64 | $ | 28,177.00 |
| | 12/19/2003 | 3,000 | $ | 5.55 | $ | 16,650.00 |
| | 12/19/2003 | 3,000 | $ | 5.57 | $ | 16,710.00 |
| | 11/10/2003 | 8,800 | $ | 5.21 | $ | 45,848.00 |
| | | **78,600** | | | **$** | **758,068.98** |
| Cary L. Deacon | 9/1/2004 | 19,300 | $ | 15.85 | $ | 305,935.88 |
| | 8/31/2004 | 130,700 | $ | 15.62 | $ | 2,041,952.24 |
| | | **150,000** | | | **$** | **2,347,888.12** |
| Michael L. Snow | 11/13/2003 | **14,000** | $ | 5.34 | **$** | **74,698.40** |
| | **TOTAL** | **1,117,900** | | | | **$14,602,039.34** |

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

68.     Plaintiff brings this action derivatively in the right and for the benefit of Navarre to redress injuries suffered, and to be suffered, by Navarre as a direct result of the breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants. Navarre is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

69.     Plaintiff will adequately and fairly represent the interests of Navarre in enforcing and prosecuting its rights.

70.     Plaintiff is and was an owner of the stock of Navarre during times relevant to the Individual Defendants' wrongful course of conduct alleged herein, and remains a shareholder of the Company.

71.     The current Board of Navarre consists of the following nine individuals: defendants Paulson, Benson, Cheney, Gentz, Weyl, Wiltz, Sippl and Snow and Gary St. Marie ("St. Marie"). Plaintiff has not made any demand on the present Board of Navarre to institute this action because such a demand would be a futile, wasteful and useless act, particularly for the following reasons:

(a)     Defendants Paulson, Cheney, Weyl, Wiltz, Sippl and Snow, as a result of their access to and review of internal corporate documents; conversations and connections with other

31

corporate officers, employees and directors; and attendance at management and Board meetings, each of the defendants knew the adverse non public information regarding the improper accounting. While in possession of this material adverse non public information regarding the Company, the following current members of the Navarre Board participated in the illegal insider selling:

(i)  During the Relevant Period, Paulson sold 700,100 shares of Navarre stock for proceeds of $9,495,081.90;

(ii)  During the Relevant Period, Cheney sold 63,700 shares of Navarre stock for proceeds of $787,590;

(iii)  During the Relevant Period, Weyl sold 10,000 shares of Navarre stock for proceeds of $117,936;

(iv)  During the Relevant Period, Wiltz sold 15,000 shares of Navarre stock for proceeds of $183,900;

(v)  During the Relevant Period Sippl sold 8,000 shares of Navarre stock for proceeds of $107,557.64; and

(vi)  During the Relevant Period, Snow sold 14,000 shares of Navarre stock for proceeds of $74,698.40. Because these defendants received a personal financial benefit from the challenged insider trading transactions, these defendants are interested and any demand upon them is futile;

(b)  The Compensation Committee of the Board determines the Company's executive compensation policy, the award equity grants under the Company's 1992 Stock Option Plan and 2004 Stock Option Plan. The Compensation Committee is comprised of defendants Weyl and Wiltz and Gary St. Marie. Defendant Benson was replaced by St. Marie on the Compensation Committee on July 26, 2005. As the members of the Compensation Committee singularly control the other defendants' awards, the remaining members of the Board will not institute this action against defendants Weyl and Wiltz. To do so would jeopardize each defendant's personal financial compensation. Thus, demand on defendants Paulson, Cheney, Gentz, Sippl, Snow and Benson is futile;

(c)      The principal professional occupation of defendant Paulson is his employment with Navarre, pursuant to which he received and continues to receive substantial monetary compensations and other benefits.   Specifically, for FY:05, FY:04 and FY:03, Navarre paid defendant Paulson $3,701,651, $2,528,675 and $796,610, respectively, in salary, bonus and other compensation, and granted him 50,000 and 150,000 options to purchase Navarre stock in FY:04 and FY:03, respectively.   Accordingly, defendant Paulson lacks independence from defendants Weyl and Wiltz, defendants who are not disinterested and/or independent and who exert influence over defendant Paulson's compensation by virtue of their position as CEO/President and Chairman of the Board and one-half of the Compensation Committee.   This lack of independence renders defendant Paulson incapable of impartially considering a demand to commence and vigorously prosecute this action;

(d)      According to Navarre's Proxy Statement filed with the SEC on or about July 29, 2003 defendants Sippl, Teo and Weyl were members of the Audit Committee and met five times during FY:03.   According to Navarre's Proxy Statement filed with the SEC on or about July 27, 2004 defendants Sippl, Benson and Gentz were members of the Audit Committee and met four times in FY:04.   According to Navarre's Proxy Statement filed with the SEC on or about July 29, 2005, defendants Sippl, Benson and Gentz were members of the Audit Committee and met five times in FY:05.   Navarre's Audit Committee Charter as filed with the SEC on the Company's 2004 Proxy states in relevant part:

> The primary function of the Audit Committee (the "Committee") is to assist the Board of Directors (the "Board") of Navarre Corporation (the "Corporation") in fulfilling its general oversight responsibilities by reviewing: the quality and integrity of the financial reports and other financial information provided by the Corporation to any governmental body or the public; the Corporation's systems of disclosure controls and procedures, internal controls over financial reporting and the ethical standards that management and the Board have established; the Corporation's auditing, accounting and financial reporting processes generally; the independence, qualifications, and performance of the Corporation's independent auditor; the Corporation's compliance with the Corporation's Code of Business Conduct and Ethics; and the Corporation's overall compliance with legal and regulatory requirements.
>
> * * *
>
> To fulfill its responsibilities and duties, the Audit Committee shall:

Documents/Reports Review

1.      Review and reassess the adequacy of this Charter at least annually, and more frequently as conditions dictate, and propose any amendments to the Charter as it deems necessary or appropriate.  Submit the Charter to the Board for approval and cause the Charter to be approved and disclosed in periodic filings as frequently as may be required by the regulations of the Securities and Exchange Commission and the rules of The NASDAQ Stock Market (as such regulations may be modified or supplemented from time to time).

2.      Review the Corporation's annual audited financial statements before they are filed with the Securities and Exchange Commission or released. Review should include discussion with management and the independent auditors of significant issues regarding critical accounting estimates, accounting principles, practices and judgments and a review with the independent auditors of any auditor report to the Committee required under the rules of the Securities and Exchange Commission or The NASDAQ Stock Market (as may be modified or supplemented from time to time). Review should also include review of the independence of the independent auditors (see Item 7 below) and the discussion with the independent auditors of the conduct of their audit (see Item 10 below). Based on such review, determine whether to recommend to the Board that the annual audited financial statements be included in the Corporation's Annual Report on Form 10-K filed under the rules of the Securities and Exchange Commission.

3.      Review with management and the independent auditors the Corporation's quarterly financial reports before they are filed with the Securities and Exchange Commission or released.

4.      Report Committee actions to the Board of Directors with such recommendations as the committee may deem appropriate.

5.      Prepare a report to shareholders to be included in the Corporation's annual proxy statement as required by the rules of the Securities and Exchange Commission and The NASDAQ Stock Market (as such rules may be modified or supplemented from time to time).

6.      Review the regular internal reports to management, or summaries thereof, prepared by the internal auditing department, as well as management's responses. Review other relevant reports or financial information submitted by the Corporation to any governmental body or the public, including management certifications as required by the Sarbanes-Oxley Act of 2002, and relevant reports rendered by the independent auditors, or summaries thereof.

Nonetheless, the Audit Committee recommended that the Board issue the false press releases, earnings statements, Shelf Registration Statement and Form 10-K as filed with the SEC on or about June 29, 2004.  By such actions, defendants Sippl, Benson and Gentz breached their duties by causing or allowing the improper financials described above. As a result of these defendants' breach of their duties, any demand upon them is futile;

(e)      According to Navarre's Proxy Statements filed with the SEC on or about July

29, 2005, July 27, 2004, July 29, 2003 and July 29, 2002, defendants Benson, Cheney, Gentz, Weyl, Wiltz, Sippl and Snow each hold a large number of unvested Navarre stock options. Specifically, Benson holds 44,800 stock options; 11,200 will vest each year for the next four years. Cheney holds 39,600 stock options that will vest over the next three years. Gentz holds 3600 stock options which will vest 1200 a year for the next three years. Sippl, Snow and Wiltz each hold 44,400 stock options which will vest at various times over the next four years and defendant Weyl holds 43,200 stock options which will all vest at various times over the next four years. The stock options granted to defendants Benson, Cheney, Gentz, Weyl, WIltz, Sippl and Snow will not expire until six years after their respective grant dates. Under both the Company's 1992 and 2004 stock option plan, unvested stock options granted to non-employee directors cease to vest if the director's Board service is terminated. Thus demand upon defendants Benson, Cheney, Gentz, Weyl, Wiltz, Sippl and Snow is futile because they had an interest in safeguarding their unvested stock options;

(f)     The entire Navarre Board and senior management participated in the wrongs complained of herein. Navarre's directors are not disinterested or independent due to the following: defendants Paulson, Benson, Cheney, Gentz, Weyl, Wiltz, Sippl and Snow served on the Navarre Board during the Relevant Period. Pursuant to their specific duties as Board members, each was charged with the management of the Company and to conduct its business affairs. Each of the above referenced defendants breached the fiduciary duties that they owed to Navarre and its shareholders in that they failed to prevent and correct the improper financials. Thus, the Navarre Board cannot exercise independent objective judgment in deciding whether to bring this action or whether to vigorously prosecute this action because its members are interested personally in the outcome as it is their actions that have subjected Navarre to millions of dollars in liability for possible violations of applicable securities laws;

(i)     Each of the key officers and directors knew of and/or directly benefitted from the wrongdoing complained of herein;

(g)     The defendant directors of Navarre, as more fully detailed herein, participated in, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from Navarre's stockholders or recklessly and/or negligently

35

disregarded the wrongs complained of herein, and are therefore not disinterested parties;

(h)     In order to bring this suit, all of the directors of Navarre would be forced to sue themselves and persons with whom they have extensive business and personal entanglements, which they will not do, thereby excusing demand;

(i)      The acts complained of constitute violations of the fiduciary duties owed by Navarre's officers and directors and these acts are incapable of ratification;

(j)      Each of the defendant directors of Navarre authorized and/or permitted the false statements disseminated directly to the public or made directly to securities analysts and which were made available and distributed to shareholders, authorized and/or permitted the issuance of various of the false and misleading statements and are principal beneficiaries of the wrongdoing alleged herein, and thus could not fairly and fully prosecute such a suit even if such suit was instituted by them;

(k)     Any suit by the current directors of Navarre to remedy these wrongs would likely expose the Individual Defendants and Navarre to further violations of the securities laws that would result in civil actions being filed against one or more of the Individual Defendants, thus, they are hopelessly conflicted in making any supposedly independent determination whether to sue themselves;

(l)      Navarre has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Individual Defendants and current Board have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Navarre any part of the damages Navarre suffered and will suffer thereby;

(m)     If the current directors were to bring this derivative action against themselves, they would thereby expose their own misconduct, which underlies allegations against them contained in class action complaints for violations of securities law, which admissions would impair their defense of the class actions and greatly increase the probability of their personal liability in the class actions, in an amount likely to be in excess of any insurance coverage available to the Individual Defendants. In essence, they would be forced to take positions contrary to the defenses they will likely assert in the securities class actions. This they will not do. Thus, demand is futile;

and

(n)    If Navarre's current and past officers and directors are protected against personal liability for their acts of mismanagement, abuse of control and breach of fiduciary duty alleged in this Complaint by directors' and officers' liability insurance, they caused the Company to purchase that insurance for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of Navarre. However, due to certain changes in the language of directors' and officers' liability insurance policies in the past few years, the directors' and officers' liability insurance policies covering the defendants in this case contain provisions that eliminate coverage for any action brought directly by Navarre against these defendants, known as, *inter alia*, the "insured versus insured exclusion." As a result, if these directors were to sue themselves or certain of the officers of Navarre, there would be no directors' and officers' insurance protection and thus, this is a further reason why they will not bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery. If there is no directors' and officers' liability insurance at all then the current directors will not cause Navarre to sue them, since they will face a large uninsured liability.

72.    Moreover, despite the Individual Defendants having knowledge of the claims and causes of action raised by plaintiff, the current Board has failed and refused to seek to recover for Navarre for any of the wrongdoing alleged by plaintiff herein.

73.    Plaintiff has not made any demand on shareholders of Navarre to institute this action since such demand would be a futile and useless act for the following reasons:

(a)    Navarre is a publicly held company with 29,801,008 shares outstanding, and thousands of shareholders;

(b)    Making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses or phone numbers of shareholders; and

(c)    Making demand on all shareholders would force plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

## COUNT I

### Against Defendants Paulson and Gilbertson for
### Disgorgement Under the Sarbanes-Oxley Act of 2002

74.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

75.     Pursuant to Sarbanes-Oxley Act of 2002 §304, because Navarre restated its financial statements for fiscal year 2004 due to material noncompliance with SEC rules and published guidance as a result of false and misleading financial statements, defendant Paulson, as the CEO/President and a director of Navarre and defendant Gilbertson as the former CFO and director of Navarre are required to reimburse Navarre for all bonuses or other incentive-based or equity-based compensation, received by them from Navarre during 2004.

76.     Defendants Paulson and Gilbertson are also liable to plaintiff for reasonable costs and attorneys' fee in the prosecution of this derivative action on behalf of Navarre.

### COUNT II

### Against the Insider Selling Defendants for Breach of Fiduciary
### Duties for Insider Selling and Misappropriation of Information

77.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

78.     At the time of the stock sales set forth herein, the Insider Selling Defendants knew the information described above, and sold Navarre common stock on the basis of such information.

79.     The information described above was proprietary non-public information concerning the Company's financial condition and future business prospects.  It was a proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold Navarre common stock.

80.     At the time of their stock sales, the Insider Selling Defendants knew that the Company's revenues were materially overstated.  The Insider Selling Defendants' sales of Navarre common stock while in possession and control of this material adverse non-public information was a breach of their fiduciary duties of loyalty and good faith.

81.     Since the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits the Insider Selling Defendants obtained thereby.

## COUNT III

### Against All Defendants for Breach of Fiduciary Duty

82.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

83.     The Individual Defendants owed and owe Navarre fiduciary obligations. By reason of their fiduciary relationships, the Officer Defendants and Director Defendants owed and owe Navarre the highest obligation of good faith, fair dealing, loyalty and due care.

84.     The Individual Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

85.     Each of the Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the financial results of the Company and failed to correct the Company's publicly reported financial results and guidance. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

86.     As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Navarre has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

87.     Plaintiff on behalf of Navarre has no adequate remedy at law.

## COUNT IV

### Against All Defendants for Abuse of Control

88.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

89.     The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Navarre, for which they are legally responsible.

90.     As a direct and proximate result of the Individual Defendants' abuse of control, Navarre has sustained significant damages.

91.     As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

92.     Plaintiff on behalf of Navarre has no adequate remedy at law.

## COUNT V

### Against All Defendants for Gross Mismanagement

93.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

94.     By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Navarre in a manner consistent with the operations of a publicly held corporation.

95.     As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Navarre has sustained significant damages in excess of hundreds of millions of dollars.

96.     As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

97.     Plaintiff on behalf of Navarre has no adequate remedy at law.

## COUNT VI

### Against All Defendants for Waste of Corporate Assets

98.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

99.     As a result of the improper accounting, and by failing to properly consider the interests of the Company and its public shareholders by failing to conduct proper supervision, defendants have caused Navarre to waste valuable corporate assets by paying incentive based bonuses to certain of its executive officers and incur potentially millions/billions of dollars of legal

liability and/or legal costs to defend defendants' unlawful actions.

100.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

101.    Plaintiff on behalf of Navarre has no adequate remedy at law.

## COUNT VII

### Against All Defendants for Unjust Enrichment

102.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

103.    By their wrongful acts and omissions, defendants were unjustly enriched at the expense of and to the detriment of Navarre.

104.    Plaintiff, as a shareholder and representative of Navarre, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment as follows:

A.    Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment;

B.    Declaring that defendants Paulson and Gilbertson are liable under the Sarbanes-Oxley Act of 2002 and requiring them to reimburse Navarre for all bonuses or other incentive-based or equity based compensation received by them between 2003-2005;

C.    Extraordinary equitable and/or injunctive relief as permitted by law, equity and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of Navarre has an effective remedy;

D.    Awarding to Navarre restitution from the defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the defendants;

E.      Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: August 12, 2005                                    THE SPENCE LAW FIRM

RUSSELL M. SPENCE, JR.
700 Lumber Exchange Building
10 South Fifth Street
Minneapolis, MN 55402
Telephone: 612/375-1555
Facsimile: 612/375-1511

ROBBINS UMEDA & FINK, LLP
BRIAN J. ROBBINS
JEFFREY P. FINK
610 West Ash Street, Suite 1800
San Diego, CA 92101
Telephone: 619/525-3990
Facsimile: 619/525-3991

PROVOST UMPHREY LAW FIRM, LLP
JOE KENDALL
WILLIE BRISCOE
3232 McKinney Ave, Suite 700
Dallas, TX 75204
Telephone: 214/744-3000
Facsimile: 214/744-3015

Attorneys for Plaintiff

G:\Navarre\Complaints\Navarre Der. Cpt.doc